FRANCES DAVID, complainant-respondent,

*v.*

LEVI DAVID et al., defendants-appellants.

[Submitted May 27th, 1932.   Decided October 17th, 1932.]

On appeal from decrees advised by Advisory Master Marshall Van Winkle, who filed the following conclusions:

"The defendants are Levi David and his three daughters, Bertha Rubenstein, Elene D. Loeb and Dorothy A. David. Complainant, the wife, the widow of a Dr. Samuel Brown, was married to defendant Levi David, on June 19th, 1929. Previously to this marriage, and for many years, Levi David had been living separately from his first wife, by whom he had several children, all apparently well over twenty-one years of age at the time of his second marriage, his marriage to complainant.   The testimony was to the effect that Levi David was estranged from his children as well as from his first wife for this long period.

"Complainant testified that she knew Levi David about nine years before she was married to him; that she several times lent him sums of money; that in September, 1928, she lent him $1,000; that he gave her a note for this loan.   She took possession of a small hotel on New York avenue, Atlantic City, which was opposite the Pitney Hotel owned by Levi David.   She testified that she went to Baltimore for a rest, and that upon her return in February, 1929, 'he came over and helped me with the suitcases, and I came into the house, and

oh, he was so glad to see me, and then he says—oh, yes, by the way he said he had some news, and he was like overjoyed, you know, with a glad smile. Yes, and he said his wife died a couple of months ago.'

"Complainant testified that shortly after this conversation that the negotiations proceeded:

" 'Well, he asked me if I have—whenever I have time to, he would like to talk to me. I says, "well, I have time now." He says, "all, right." So we went in the front room and sat down, so he asked me if I had ten thousand dollars. He says —he looked at me; he says, "I know it is rather personal, but the reason I am asking you that," he says, "I have got some business proposition to put to you." "Well," I says, "no, I havent's got any ten thousand dollars." I says, "I have eight, and a thousand dollars that you owe me, that is nine thousand." Then he says, "well, then, that is all right." He says the reason he asked me that he said if I let him have it, he will make me half a partner in his properties, he says, but he says, with the understanding, he says, "that if you are willing to marry me." Of course I thought it was a rather serious proposition that he put then to me, and I says, "well, I tell you, Mr. David," I says, "I can't say nothing right now," I says, "I will have to think it over. If you give me a couple of weeks time," I says, "I will let you know." He says, "oh, yes, indeed, I didn't expect you to answer right now, but I just put that proposition to you." '

"Complainant testified that she thought over matters and in June consented to Levi David's proposition:

" 'You see, when I went to the bank, when I agreed that I will marry him, I says, "yes, I will accept that proposition." "Well, then," he says, "you go up to the lawyer and make an appointment." I call up the lawyer and made an appointment. 'Q. Who was the lawyer whom you called? A. Mr. Champion. Q. Of Babcock & Champion? A. Yes, sir. So the following morning Mr. Champion says to be up there. So I also made the same time an appointment with Mr. David to come into the—to meet me at my place, we will both go together. So he says all right, and he met me nine-thirty,

and I was in the bank nine o'clock and took the money out, and also—eight thousand dollars. I also took out the note of the thousand dollars. And while I was there at the vault I took out the deed of my own property. Of course he never mentioned that to me and I never spoke to him about it, but I took it out myself, and when we went to the lawyer to told him,' I says, "Mr. David, you know what I decided," I says, "I have my own property, you know," and I says, "I will also convey it in your name, too, because," I says, "well, as long as you mean well, so do I," I says, "and I want all together you know, it shouldn't be mine and yours straight." And he says that was very nice  *  *  *.  Well, when Mr. Champion explained to Mr. David, you know, and me about the deeds, and he says, "you understand what it means, you know that you convey your half of interest in the property and so does Mrs. David—Mrs. Brown," and he says what— then he also mentioned about the survivor would get it all. 'Q. That is, it was to be a joint tenancy?  A. Joint tenancy. Q. And the survivor was to get whatever was left?  A. Yes.' Then he says, "you understand what I mean, and whoever dies first, you know, then goes to the other."  A. So when— at the time I was a little nervous, and this I didn't think until I—when I went out. So in the afternoon when I thought over what Mr. Champion said, I told it to my husband, Mr. David, I says, "you know one thing," I says, "he said something there and I really feel funny about it because," I says, "he said the survivor get it all and," I says, "we don't know tomorrow who will die first, and I have my children are poor, and they are small, and they need my support and," I says, "if I die first, you know, what justice am I doing to the children," I says, "they will be left a public charge."  He says, "oh, well, I would take care of them, but," he says, "it doesn't matter to me, I didn't ask you for it, you done it yourself, and I thought it is nice."  He says, "your property is just the spit in the bucket," that is the words he really used. He says, "you have the big mortgage on it, anyhow; it is a small property."  'Q. Did you finally agree to leave that out of consideration?  A. Yes, sir, and did he.'

"Two deeds of conveyance were executed by the defendant, Levi David, one conveying his Atlantic City property and the other conveying three properties owned by him on North Second street, Philadelphia, to himself and Mrs. Brown as joint tenants. Levi David acknowledged the execution of the deeds before Mr. Champion, master in chancery.

"Complainant testified that she gave Levi David the note for $1,000 and also the $8,000 that she had told him she had.

"Mr. Champion testified as to what happened at the time the deeds were executed. He had the benefit of a rather full memorandum which he had written at the time. His testimony supports complainant's version. Mr. Champion testified that he explained the effect of the deeds to Levi David; that he had no interest in the transaction except that of an attorney; that he was paid only for his time, apparently $60 or $75. There were encumbrances on the Atlantic City property, a first and a second mortgage. The Philadelphia properties apparently were each encumbered by a mortgage. Complainant alleged that her husband had defaulted on one of the mortgages covering the Atlantic City property, with the plan of divesting complainant's interest in the property, and that he was proceeding or arranging to proceed in the same way with respect to the Philadelphia properties, one or more.

"After the marriage at Wildwood, the complainant and her husband occupied the same bed in a room in the Wildwood home of complainant's sister. Complainant testified that the marriage was consummated at Wildwood, and at Atlantic City, on the return from Wildwood; that she and her husband went to New York and cohabited as husband and wife, in the Manger Hotel, and also thereafter in Green's Hotel in Philadelphia, and at 307 Atlantic avenue, Atlantic City, where she and her husband went to live, where they both occupied the same bed, until January, 1930, when they moved to another apartment in Atlantic City; that on May 2d, 1930, her husband brought two men employed by a storage company to the apartment; that, with the assistance of these men, he took from the apartment his trunk with his belong-

ings; that he concealed the place to which he was going, by stating that he was going to a certain other place; that he left against her wishes and her protest; that he left her penniless, since which time she had received no support.

"The two men from the storage company testified, fully corroborating complainant. One of these men, being sorry for complainant, went to her, a day or two after, and told her where the husband had gone.

"Two witnesses testified in corroboration of consummation at Atlantic City.

"Defendant Levi David flatly contradicted complainant, Mr. Champion, the witnesses on consummation of the marriage, and the two moving men. He testified that he met complainant on the street in March, 1929, and added:

" 'When I passed there, somebody—I went on this side of the street and she was on the other side. She was there—she was on the north side of the street. Then somebody call me. Somebody call me, then I looked around. Then she raise her hand and wave a little. Then I waited. I never see her before. I never know her before. The she came to me and say, "Mr. David, is it your hotel rented?" I say, "yes, is rented, that man got an agreement for two years yet." She say, "I am awful sorry, I got a good party for you." I say, "I am sorry, too, that the hotel, he got an agreement for two years." After that she say ,"well, Mr. David, how is going?" I say, after that, I say, "Isn't that Mrs. Brown?" She says, "yes, I am Mrs. Brown," Then she said—stop again to talk, "well, what is the matter don't get married?" and so on. I say, "well, I didn't get the right one yet." That is begin to talk. She told me she is fixing up the house, and she asked me about married. I says I didn't have the right one yet. She says, "how is it about when the right one stand right in front of you?" I says, "I don't know." '

"Defendant Levi David testified that he was nearly seventy-four years of age at the time of the hearing. Complainant testified that she was thirty-nine years of age at the time of the marriage; that she understood defendant was fifty-five years of age at the time of the marriage; that de-

fendant had stated to the mayor who officiated at the marriage that his age was fifty-five. The certificate of marriage shows defendant's age as fifty-five. Defendant testified he gave his age as fifty-six. He testified that Mr. Champion read the deeds to him; that he thought he was signing for 'a third' of the properties; that he thought his wife was entitled to a third. Later, he testified that he thought he was giving her 'twenty-five per cent.' or 'a quarter.'

"Only two witnesses testified for defendant. One, Mrs. Shapiro, testified that complainant and the other witness, Lillian Gilbert, met in Mrs. Shapiro's store 'a few month ago.' Lillian Gilbert testified that complainant then said, upon complainant being introduced to her, by Mrs. Shapiro, who then stated that Lillian Gilbert knew defendant Dorothy David, that she, complainant, had had no intercourse with her husband; that Mrs. Shapiro 'was right there and heard the whole conversation;' but Mrs. Shapiro did not testify to hearing any such conversation. It is extremely unlikely that complainant would make any such statement to a woman to whom she had just been introduced, when she knew that her husband was contesting in this court her marriage to him on the ground of non-consummation. Complainant denied having had any such conversation with Lillian Gilbert.

"On April 5th, 1930, prior to the abandonment, the husband conveyed his interest in his Atlantic City property to his three daughters, the defendants Bertha Rubenstein, Elene D. Loeb and Dorothy A. David, the consideration for the conveyance being expressed in this deed as $12,000 and love and affection.

"The answer of the defendants states that the defendant Levi David, on April 5th, 1930, conveyed his interest in his Philadelphia properties to the same daughters 'for cash moneys loaned and advanced from time to time by each of them to the said Levi David.' The husband testified that he conveyed the Philadelphia properties to these three daughters because 'I owed them money; they did not pay anything when I delivered deeds. I owed them $12,000.'

"Any rents received from the properties have not been re-

ceived by complainant, but apparently rents were received by the husband and/or his daughters.

"Complainant's bill of complaint alleges that defendant Levi David abandoned complainant and had neglected or refused to support her, and prays for a decree that he be decreed to maintain the complainant. And the bill prays for a discovery of the real estate belonging to Levi David; for a discovery of the consideration paid by the defendants Bertha Rubenstein, Elene D. Loeb and Dorothy A. David for the conveyance or conveyances by Levi David to them; for a discovery of the rents; that the defendants Bertha Rubenstein, Elene D. Loeb and Dorothy A. David be decreed to convey the premises conveyed by the defendant Levi David so that the same may be sold if necessary, to comply with the decree of this court; that a receiver be appointed; that the defendants account for the rents.

"The joint and several answer of all the defendants denies the allegations of the bill, and avers that the conveyances to the defendants Bertha Rubenstein, Elene D. Loeb and Dorothy A. David were in payment of a cash indebtedness owed by Levi David to them severally; that the conveyance by him to them was for a valuable consideration; and denies a consummation of the marriage.

"There are two counter-claims, one by Levi David, in which he alleges that the conveyance to complainant was made in consideration that the complainant should marry him and consummate said marriage; that complainant refused to consummate the marriage; that Levi David never intended to convey to complainant a one-half interest in the premises, but only one-third interest therein; that this counter-claim prays that the conveyance to complainant may be set aside.

"The second counter-claim prays that the marriage between Levi David and complainant may be declared null and void, for fraud. At the hearing, this second counter-claim was amended so that it became the counter-claim of the defendant Levi David 'for the use of Bertha Rubenstein, Elene D. Loeb and Dorothy A. David.'

"The testimony of the husband was unsatisfactory, not

credible, and in large part a tiresome iteration of 'I do not remember.' His testimony was plainly false in many particulars. Apparently he was not only estranged from his first wife and his daughters, defendants Bertha Rubenstein, Elene D. Loeb and Dorothy A. David, for many years, but he was bitter towards them all during the same period. His relations with his daughters were such that it is altogether unlikely that he would get money from them or that he had love or affection for them. I think he deliberately lied in giving his testimony. He impressed me very unfavorably. On the other hand, complainant seemed to me to be a truthful witness, and a woman who had made a great mistake in marrying this man, but who had done so honestly and in good faith.

"By the conveyances to the daughters the husband divested himself of all his property. There is no proof of any consideration for the conveyances. It is clear that they were made with actual intent to defraud complainant.

"The conveyances seem to have been made to the daughters equally. In making these omnibus conveyances, there was no attempt to match the values of the properties with the total of the sums alleged to be due to the grantees, nor any attempt to convey to the daughters in proportion to the alleged several debts due the daughters respectively.

"None of the daughters testified. It may be that the daughters did not testify because, for one reason, that the wife's allegation was true, namely, that the mortgages on the properties were being foreclosed at the instance of the husband, to defeat complainant's interest in the properties, so that any decree to come, if against the husband, would not, in the daughters' view, have much effect.

"Defendants made no real attempt to prove the existence of any antecedent indebtedness which might furnish a consideration for the conveyances. It is clear that the conveyances were made as part of the husband's plan to defeat the wife's claim for support.

"I find there was no fraud in the marriage; that the marriage was consummated; that the husband unjustifiably

abandoned complainant and refused and neglected to support her; and I advise a decree for maintenance, and will fix the amount thereof, and of counsel fees, on application. And I advise a decree that the defendants make discovery of the profits of the properties conveyed; that they account for one-half part of such profits; and that the counter-claim of the defendants be dismissed.

"(After deciding as above herein stated, it appearing that the husband was not complying with the decree for maintenance which had been entered, and that he could not be found, a supplemental decree was signed, adjudging that the conveyances were without consideration and made for the purpose of defrauding complainant, and directing a reconveyance of the properties.)"

*Mr. John C. Reed,* for the appellants.

*Mr. Alfred Brenner,* for the respondent.

PER CURIAM.

We concur for the most part in the results reached by the advisory master, and for the reasons stated by him.

But we conclude that the amount of the second counsel fee allowed, $500, is excessive and that it should be reduced to $150. We think also that the allowance of $30 per week alimony was, under the circumstances, excessive, and that it should be reduced to $20 per week. With the above modifications the decrees brought up will be affirmed. No costs will be allowed.

*For modification*—THE CHANCELLOR, TRENCHARD, PARKER, LLOYD, CASE, BODINE, DONGES, BROGAN, VAN BUSKIRK, KAYS, DEAR, WELLS, KERNEY, JJ. 13.